UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------X          **JURY DEMAND**

AJW PARTNERS, LLC, AJW OFFSHORE,
LTD, AJW QUALIFIED PARTNERS, LLC,
and NEW MILLENNIUM CAPITAL                              Civil Case No.
PARTNERS II, LLC,                                      **07 Civ. 8719** (PAC) (DFE)
               Plaintiffs,

                              Hon.  Paul A.  Crotty, U.S.D.J.
  - against -                                         Hon.  Douglas F.  Easton, U.S.M.J.

EMTA HOLDINGS, INC.,

               Defendant.             **ANSWER, AFFIRMATIVE DEFENSES**
----------------------------------------------X           **and COUNTERCLAIMS**

Defendant EMTA Holdings, Inc.  ("EMTA"), by its attorneys Eric W.  Berry Law Office

pc, for its Answer, Affirmative Defenses and Counterclaims, alleges as follows:

<u>**ANSWER**</u>

1.   Denies knowledge or information sufficient to respond to the allegations in

paragraphs 1-4 of the Complaint, except asserts that none of the plaintiffs is a citizen,

resident or domiciliary of either Arizona or Nevada within the meaning of 28 U.S.C.

§1332(c)(1).

2.   Admits the allegations in paragraphs 5 and 13 of the Complaint.

3.   Denies the allegations in paragraphs 6, 14, 15, 17, 20, 22, 24, 26, 28 and 29 of the

Complaint.

4.   Neither admits nor denies the allegations in paragraph 7 of the Complaint because

the defined term ("the 'Notes'") is ambiguous.

5.   With respect to paragraph 8 of the Complaint, admits that agreements exist between the parties, but denies knowledge of which particular agreements are referenced by the allegations in paragraph 8.

6.  With respect to paragraphs 9-12, 16 and 18 of the Complaint, refers the Court to the terms of the instruments referenced therein.

7.  With respect to the allegations in paragraphs 19, 21, 23, 25 and 27 of the Complaint, answers by realleging the responses to the respective paragraphs of the complaint that are cross-referenced therein.

## ALLEGATIONS RELEVANT TO ALL AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

### A.  Jurisdictional Allegations

8.  This Court has federal subject matter jurisdiction over the Counterclaims asserted herein under 28 U.S.C. §§1331 and 1337, §10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b),  and the rules and regulations promulgated thereunder by the United States Securities and Exchange Commission ("the SEC").

9.  Additionally, plaintiffs, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the mail, interstate telephone and other electronic communications, including fund transfers and the facilities of the Over-the-Counter Bulletin Board  of the National Association of Securities, Dealers, Inc. ("OTC-BB").

10.   This Court has supplemental subject matter jurisdiction over the state and common law Counterclaims pursuant to 28 U.S.C. §1367.  Further, the state and common law Counterclaims are so related to the Counterclaims over which this Court has federal

question jurisdiction that they are part of the same case or controversy.

11.    Additionally, this Court has original subject matter jurisdiction under 28 U.S.C. §1332, on the grounds that complete diversity of citizenship exists between the adverse parties and because the amount of controversy is in excess of $75,000, exclusive of costs and interest, as stated in the *Ad Damnum* clause of plaintiffs' complaint.

**B.  Parties**

12.  EMTA Holdings, Inc. (OTC BB:EMHD.OB - News) is an energy and fuel conservation company, and manufactures and distributes petroleum and metal treatment products.  EMTA owns patented technologies for manufacturing fuel additives, such as  a "low emission diesel fuel catalyst," which have tremendous potential value, since they are capable of assisting fuel manufacturers in complying with emissions standards already in place in several states and under consideration in many other states.

13. Plaintiffs are investment vehicles, owned, controlled and/or sponsored by NIR Group, LLC ("NIR").   Plaintiffs engage in what are commonly known as a "private investments in public equity" or "PIPES."  Plaintiffs' activities include providing funding in consideration for "floating debentures."  "Floating debentures" refer to debt instruments which enable the holder to convert the obligor's outstanding indebtedness into stock ownership in the obligor according to a formula which reflects the current market price of the stock.

**C.  The Nature of the Dispute**

14.  EMTA seeks monetary, declarative and injunctive relief to redress the irreparable harm caused by plaintiffs' illegal trading scheme, which illegally manipulated

and artificially depressed the price of EMTA's stock.

15.   Specifically, in April 2006, EMTA entered into a "Securities Purchase Agreement" ("SPA") which provided that EMTA would issue "convertible" notes ("the Notes" or "the Convertible Notes") in the total amount of $3 million.  These Notes permitted plaintiffs to convert EMTA's outstanding indebtedness into EMTA common stock according to a variable "Conversion Price" defined in the Notes.  Section 1.2 of each Note provided that the "Conversion Price" would be calculated by multiplying (A) the average of the three lowest trading prices for the common the stock during the 20-day period preceding the date upon which plaintiffs sent the conversion notice to EMTA by (B) by the "Applicable Percentage" which was either 50 percent; 55 percent in the event the Registration Statement for the stock was filed; or 60 percent in the event the Registration Statement was effective. Accordingly, the lower the price at which the EMTA stock traded, the more shares plaintiffs would obtain for the conversion of a given amount of EMTA' s indebtedness.  EMTA also issued warrants ("the warrants") to plaintiffs which granted plaintiffs the right to purchase a large amount of EMTA stock at $2.50 per share.

16.   Unbeknownst to EMTA, at the time these agreements were negotiated with plaintiffs, plaintiffs harbored a plan to use these agreements to acquire and trade EMTA stock in a manner which would drive down the market price of EMTA's stock, prevent EMTA from obtaining funding from other sources, cause EMTA to remain tremendously indebted to plaintiffs, and eventually permit plaintiffs to obtain control of EMTA's valuable technologies.

### (i) **The Legal Prohibition Against Short Selling EMTA Stock**

17.    Section 10(b) of  Securities Exchange Act of 1934 ("1934 Act") prohibits the use of "manipulative" and "deceptive" devices in the purchase or sale of securities, as well as any "contrivance in contravention of such rules and regulations of the [SEC]."

18.  Regulation T, promulgated pursuant to §7 of the 1934 Act, governs lending activities by brokers and sets margin rules, and Regulation X provides the corresponding borrowing rules for customers.   Under Regulation T, credit may be extended only for stock list on a national securities exchange or the National Market System.

19.   EMTA is not an exchange-listed stock; instead it is traded by means of the  NASD OTC Bulletin Board.  Under Regulation T, EMTA stock is therefore not marginable.

20.   Since EMTA stock is not legally marginable, it cannot be sold "short."   Short-selling involves selling shares which have been borrowed from the seller's broker  The proceeds of a short sale are deposited into the sellers account, but this money is borrowed, because it represents the proceeds from the sale of borrowed securities. Short-selling therefore results in the seller having borrowed money in his account, and this money is subject to the same margin restrictions which govern buying stock or, in the case of stocks like EMTA's, subject to the same *prohibition* against extension of credit.

### (ii) **The Contractual Prohibition Against Short Sales**

21. EMTA was aware that, despite the legal prohibitions against short-selling Bulletin Board stocks, the practice was nevertheless widespread by investors who held floating convertible debt instruments issued by Bulletin Board companies. Such

5

transactions, like that which plaintiffs were seeking from EMTA, are typically structured to allow the stock to be acquired at a substantial discount to the market price. A typical short-seller has the risk of having to cover the "short sales" by buying stock in to the open market at an increased price.  By contrast, the holder of a "floating convertible debenture" does not have this risk, since the "floating debenture" is structured to permit the stock to be acquired at a steeply discounted price.  The structure of floating debentures thus encourages short selling.

22.    EMTA further understood that, given the large volume of EMTA stock which plaintiffs would be entitled to acquired under their Notes, absolute assurance that plaintiffs would not short-sell the stock was necessary since systematic short-selling typically drives down the market price of the stock.

23. Large scale short selling by the holder of the sort of "unfixed" or "floating" convertible debentures that plaintiffs were seeking to obtain consideration for providing funding to EMTA is especially fraught with danger for the issuer.  Large-scale shorting of the stock leads to a "double win" by the holder of a floating debenture, since it drives the price down in a risk-free fashion, and increases the number of shares to be issued when the indebtedness is converted into stock.  In turn, the large distributions required to comply with conversion requests made by the holder of the debenture further depress the market price, increase the financial pressure on the issuer and make the issuer even more dependent on cash infusions which may only be available from PIPE investors.  For these reasons, investments made pursuant to floating debentures which are not subject to contractual short-sale prohibitions are known as "death spiral" financing and can lead to the funding source

obtaining control of the company's assets at a fraction of their value.

24.  Accordingly, in order to protect itself from the "death spiral" situation, and  as condition to transaction, EMTA specifically requested a contractual representation by plaintiffs that they would not engage in any short selling of the EMTA stock they acquired by converting the debentures.  Plaintiffs specifically agreed with his request and, as an inducement for EMTA's assent to the transaction, plaintiffs represented in ¶4(n) of the SPA that they would not engage in any short sales of the EMTA stock.  Paragraph 4(n) provides:

> Restrictions on Short Sales.  The Buyers agree that so long as any of the Notes remain outstanding, but in no event less than two years from the date hereof, the Buyers will not enter into any "short sales" (as such term is defined in Rule 3b-3 of the [Securities Exchange Act of 1934] of the Commons Stock or hedging transaction which establishes a net short position with respect to the Common Stock.

25.  Plaintiffs' representation that they would not engage in short-selling was material to EMTA, EMTA specifically relied upon this representation and would not have entered into the Securities Purchase Agreement had plaintiffs not promised to refrain from short-selling.

26.  Moreover, the contractual prohibition against short sales by plaintiffs was intended by EMTA as its principal protection against plaintiffs engaging in large scale short-selling.  EMTA therefore reasonably believed it was avoiding a death spiral situation – or at minimum reducing the risk  – by obtaining plaintiffs' contractual promise to refrain from short selling the stock and would not have concluded the SPA or issued the Convertible Notes, had plaintiffs not made this representation.

**(iii) Plaintiffs' Representation That They Would Not Short**
**Sell the Stock Was False When Made**

27. Unbeknownst to EMTA, plaintiffs never had any intention whatsoever of complying with their contractual representation that they would not short sell the stock and that representation was intentionally false when made.

28. According to published reports, the plaintiffs (and the "NIR Group" of which plaintiffs are a part), invested $77 million in "convertible debenture" transactions in the year preceding the SPA. EMTA was not aware of this until well after the SPA was signed.

29. In many of these transactions, plaintiffs, NIR's chief principal and executive, Corey Ribotsky, and other representatives of plaintiffs, frequently made verbal and/or written representations to the issuers of the convertible debt (if not the sort of contractual representations made to EMTA) that they would refrain from short-selling the issuer's stock, then proceeded to routinely breach those representations.

30. For example:

(a) Between 2004 and 2006, plaintiffs promised a company known as Cyberlux Corp. that they would refrain from short selling Cyberlux in consideration for Cyberlux agreeing to issue notes, debentures and/or warrants granting plaintiffs rights to acquire Cyberlux stock. As it turned out, plaintiffs repeatedly breached these representation to Cyberlux, as alleged *Cyberlux Corp. v. AJW Offshore, LLC*, Civil Case No. 07 Civ. 7808 (U.S.D.C., S.D.N.Y.) (DAB).

(b) In 2001, plaintiffs promised a company known as AirTech International Group, Inc. that they would refrain from short selling AirTech stock in consideration for AirTech agreeing to issue notes, debentures and/or warrants granting plaintiffs rights to acquire AirTech stock. As it turned out, plaintiffs repeatedly breached these representations to AirTech, as alleged in *New Millenium Capital Partners II, LLC v. Humitech International Group, Inc.*, Civil Case No. 3-06-CV-1180L (U.S.D.C.,W.D. Tex.).

(c) In 2006, plaintiffs promised a company known as RG Global Lifestyles, Inc. that they would refrain from short selling RG Global Lifestyles stock in consideration for RG Global Lifestyles agreeing to issue notes, debentures and/or warrants granting plaintiffs rights to acquire RG Global Life Styles stock. As it turned out, plaintiffs routinely breached these representations to RG Global Lifestyles, as alleged in *AJW Partners, LLC v. RG Global Lifestyles, Inc.*, 07 Civ. 1835 (U.S.D.C., S.D.NY) (PAC).

- and -

(d) In 2006, plaintiffs promised a company known as Rootie Beer Corp. that they would refrain from short selling Rootie Beer Corp. stock in consideration for Rootie Beer Corp. agreeing to issue notes, debentures and/or warrants granting plaintiffs rights to acquire Rootie Beer Corp. stock. As it turned out, plaintiffs routinely breached these representations to Rootie Beer Corp., as alleged in *AJW Partners, LLC v. Rootie Beer Corp.*, 07Civ. 1835 (U.S.D.C., S.D.NY) (PAC).

31.  Plaintiffs' pattern of routinely short-selling the stock of the companies  from which they had received floating debentures, despite assurances that they would not do so, was not known to EMTA until well after the SPA was signed.

32.  Plaintiffs' pattern of routinely short-selling the stock of these other companies confirms that, at the time the SPA was signed, plaintiffs had no intention of complying with the representation in ¶4(n) of that agreement that it would not short-sell EMTA stock.

33.  Plaintiffs' sole purpose in making the representation was to fraudulently induce EMTA to conclude the SPA and issue the "Convertible Notes" plaintiffs are seeking to enforce in this case.

34.  In a February 12, 2007 *Forbes* article entitles "Sewer Pipes," plaintiffs' attorney, Jonathan Schecter, Esq. was quoted as saying that plaintiffs "never short[]" a stock.  This statement was false, and was designed to mislead EMTA and others  concerning plaintiffs' trading practices.

**(iv) Plaintiffs' Systematic Short selling of EMTA Stock**

35.  In November 2006 and between February 2007 and August  2007 plaintiffs systematically short sold EMTA stock on at least eleven separate occasions. On each occasion, plaintiffs requested delivery of EMTA common stock, and "short sold" the stock illegally on each occasion before the stock was actually or legally within its possession or control.  As it turned out, these requests and the ensuing transactions were part of a scheme which involved plaintiffs' short-selling EMTA stock and then covering their short positions at the discounted prices calculated under the formula set forth in the Convertible Notes.

36.  These requests, in the aggregate, called for delivery of more than 1,200,000 shares, and can be summarized as follows:

| (1) Noteholder/ Allocation | (2) Requested By Plfs. | (3) Conv. Price | (4) Certificate Ordered | (5) Sent by Transfer Agent | (6) Sale Date |
|---|---|---|---|---|---|
| AJWP 16,500 AJWQ 43,500 AJWO 88,500 NMCP 1500 | Nov 9 '06 | 1.4583 | Nov 10 '06 | Nov 14 '06 | Nov 9 '06 |
| AJWP 16,500 AJWQ 43,500 AJWO 88,500 NMCP 1500 | Mar7 '07 | .23 | Mar20 '07 | Mar21 '07 | Mar7 '07 |
| AJWP 16,500 AJWQ 43,500 AJWO 88,500 NMCP 1500 | Mar26 '07 | .055 | Apr4 '07 | Apr26 '07 | Mar26 '07 |
| AJWP 16,500 AJWQ 43,500 AJWO 88,500 NMCP 1500 | May9 '07 | .155 | May18 '07 | May21 '07 | May9 '07 |
| AJWP 16,500 AJWQ 43,500 AJWO 88,500 NMCP 1500 | May31'07 | .086 | Jun6 '07 | Jun7 '07 | May31 '07 |
| AJWP 16,500 AJWQ 43,500 AJWO 88,500 NMCP 1500 | Jun8 '07 | .071 | Jun8 '07 | Unknown | Jun8 '07 |
| AJWP 7700 AJWQ 20,300 AJWO 41,300 NMCP 700 | Jun22 '07 | .066 | Jul2 '07 | Unknown | Jun26 '07 |
| AJWP 23,200 AJWQ 8500 AJWO 47,200 NMCP 800 | Jun26 '07 | .066 | Jul2 '07 | Unknown | Jun26 '07 |
| AJWP 16,500* AJWQ 43,500 AJWO 88,500 NMCP 1500 | Jul5 '07 | .068 | Jul13 '07 | Jul24 '07 | Jul5 '07 |
| AJWP 16,500 AJWQ 43,500 AJWO 88,500 NMCP 1500 | Jul25 '07 | .083 | Jul 26 '07 | Jul31 '07 | Jul25 '07 |
| AJWP 16,500 AJWQ 43,500 AJWO 88,500 NMCP 1500 | Aug1 '07 | .073 | Aug2 '07 | Aug16 '07 | Aug1 '07 |

*Due to a clerical error, only 6500 shares were ordered immediately by EMTA. The mistake was noticed and corrected when the stock transfer agent issued an additional 10,000 shares on July 25.

37.  Comparison of Column (5) in the foregoing table  – the date the stock was sent by the transfer agent – with Column (6) -- the date plaintiffs sold the stock -- confirms that the stock that plaintiffs sold could not have been in plaintiffs' actual possession at the time it was sold because the stock certificates were sent by the Stock Transfer Agent between five and 30 days after the sale date.   Under SEC Regulation SHO, for a sale to be marked "Long" the securities sold must either be in the investor's account or the customer must reasonably believe that the stock will be delivered to the broker within the three-day settlement period.  Regulation  SHO also requires the broker to ask  the customer whether the delivery will be made within the settlement period, and the customer is held to the "reasonable man" standard in providing that information.  Under the pertinent interpretation of Regulation SHO, a broker is not allowed to mark the sale "long" if, on a prior occasion, the customer's representation that the stock would be delivered within the settlement period had proven incorrect.   For these reasons, DSI could not have marked any of the foregoing sales "long" and would have been required to mark  them "short" instead.

38.   Since the foregoing sales of EMTA stock had to be  marked "short" by DSI, DSI the sales should have been prohibited, and each was a violation of Regulation T.

39.  Plaintiffs were fully aware that they were short-selling the stock, as reflected by a November 27, 2006 e-mail by Denise Peterson, an employee of DSI  to Allison Miller, who is employed by plaintiffs, which stated that plaintiffs' accounts "were short" EMTA stock.

40.   Also, many of plaintiffs short-sales were at the bid price. Because unrestricted short-selling would accelerate declining markets, for exchange-listed securities, the SEC's "uptick" rule permits short sales "to the bid price" only (a) when the bid price is above the price at which

the immediately preceding sale was effected (plus tick), or (b) when the bid price is at the last sale price if the last sale price is higher than the last different price (zero-plus tick).   While EMTA is not exchange listed (and therefore may not be shorted *at all*), the impact of plaintiffs' sales at the bid price  – accelerating the declining price of the stock – is precisely the danger the SEC's "uptick rule" for listed stocks is intended to prevent.

41.   As just one example of plaintiffs' scheme to depress the price of EMTA stock, plaintiffs sold 70,000 shares in one block near the close of trading and thereby drove the price down from $0.35 to $0.22.  EMTA was given this information by Ed Fine, a consultant it had hired in New York, who was familiar with and followed plaintiffs' trading of EMTA stock. EMTA also determined from "level 2 trading platform program" software that this 70,000 share block was sold by plaintiffs.  Shortly after the close, plaintiffs submitted a conversion request to EMTA for 70,000 shares, at a conversion price which reflected the dramatic drop at the close that day.  This is just one example of plaintiffs' short selling, using short-sales to drive down EMTA's price, market manipulation and subversion of the conversion formula set forth in the Convertible Notes.

42.  EMTA is in the process of analyzing the other sales of EMTA stock by plaintiffs to ascertain whether there is any direct evidence that they were timed or implemented in a fashion intended to cause a decline in EMTA stock.  Of course, the fact on each day that plaintiffs shorted EMTA stock they requested the conversion of precisely the same number of shares shorted (*compare* Column (2) of the Table set forth above *with* Column (6)) is powerful circumstantial evidence of such intent.

43.  Plaintiffs have expressly revealed their intention to drive down EMTA's stock price

13

so that no other source of financing would be available EMTA and ultimately EMTA would become so indebted to plaintiffs that plaintiffs would eventually be able to obtain EMTA's valuable technologies at a fraction of their actual worth.  Plaintiffs made these intentions clear on March 22, 2007 at a meeting with EMTA which took place on Long Island.

### (v) **Plaintiffs' Short-Selling Scheme Violated the Securities Purchase Agreement**

44.    Plaintiffs' short-selling scheme violated their express representation in ¶4(n) of the SPA that they would not short-sell EMTA stock.

45.  The short-selling scheme also violated the reasonable meaning of the SPA, the parties' actual agreement and the obligation of good faith and fair dealing because it wrongfully lowered the conversion price which plaintiffs had to pay for the EMTA stock they acquired.

46.  Plaintiffs' deliberate manipulation of the price of EMTA stock was favorable to plaintiffs and detrimental to EMTA inasmuch as it lowered the conversion price that plaintiffs were required to pay for the EMTA stock they acquired.

47.  Plaintiffs illegally and illicitly profited from their short-selling scheme by obtaining large amounts of EMTA stock at substantially and artificially manipulated discounted prices. These profits were far beyond what plaintiffs could have received if they had not engaged in the illegal trading scheme, and far beyond what plaintiffs would have been able to achieve had they refrained from illegal short selling.

### (vi)  **EMTA's Justified Refusal to Issue Additional Stock to Plaintiffs**

48.    In August 2007 EMTA became aware of the extent of plaintiffs' short-selling and that plaintiffs were engaging a scheme which involved short-selling EMTA stock, and then covering their short positions at the discounted prices calculated under the formula set forth in

the Convertible Notes.

49.   On August 24, 2007, plaintiffs requested that EMTA issue an additional 150,000 shares of stock.  Because EMTA was now apprised of plaintiffs' illegal trading schemed, EMTA refused to do so.

50. EMTA was justified in refusing to issue the additional 150,000 shares to plaintiffs because by doing so they would have participated in, and aided and abetted plaintiffs' illegal trading scheme.

51.   EMTA was also justified in refusing to issue the additional 150,000 shares to plaintiffs because plaintiffs and breached, repudiated and anticipatorily breached ¶4(n) of the SPA in which plaintiffs agreed that they would not short-sell EMTA stock.

52.   Also, the legal opinion given to the stock transfer agent, Island Stock Transfer, expired on August 9, 2007. Therefore, following August 9, 2007, Island Stock Transfer could not deliver any stock certificates to plaintiffs in any event.

53.   Furthermore, under SEC Regulation C and Rule 427, EMTA could not deliver shares as of August 9, 2007 because the financial information contained in the Registration Statement had not been updated and the prospectus therefore could not be relied upon.

54.   Also, the legal opinion the legal opinion EMTA relied upon in connection with these securities expired on August 9, 2007, so Island Stock Transfer could not deliver any stock certificates in any event.

55.   Under §3.2 of each of the Convertible Notes, EMTA had 60 days to cure any failure to deliver stock requested by plaintiffs.   Plaintiffs interfered with this "cure provision" by bring this lawsuit prior to the expiration of the 60-day period.

**(vi) <u>Plaintiffs' Additional Legal and Contractual Violations</u>**

56.   In connection with each of their sales of EMTA stock, plaintiffs failed to deliver the prospectus to the their broker, DSI, in violation of §5(b)1 of the Securities Act of 1933 ("the 1933 Act"), SEC Rule 172, as well as a breach of §2(g) of SPA. Furthermore, in connection with their sales of EMTA stock, plaintiffs' broker, DSI, failed to deliver a copy of the prospectus to the purchaser, in  violation of §5(3) of  the 1933 Act and SEC Rule 174.

57.   Paragraph 4(a) of the SPA requires plaintiffs to provide EMTA with information for inclusion in the prospectus regarding its "intended method of disposition of the . . . securities." In violation of this provision, plaintiffs did not inform EMTA that they intended to dispose of their EMTA shares by short selling them. Accordingly, as a result of plaintiffs failure to comply with ¶4(a) of the SPA, this material information was  omitted from the prospectus and is not disclosed to purchasers entitled to rely on the prospectus.

58.   Neither plaintiffs nor DSI provided a copy of the relevant prospectus to the purchasers of the EMTA stock which plaintiffs and DSI sold.   EMTA is aware of this circumstance because neither plaintiff nor DSI ever requested a copy of the prospectus and the prospectus could not be downloaded from any web-site.  By selling the stock without providing a copy of the prospectus to the buyer, plaintiffs and DSI violated SEC Regulation C and Rule 424.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense:

59.   EMTA repeats and realleges paragraphs 1 - 58 as if set forth fully herein.

60.  Plaintiffs fail to state a claim upon which relief can be granted.

### Second Affirmative Defense:

61.   EMTA repeats and realleges paragraphs 1 - 60 as if set forth fully herein.

62.  Plaintiffs alleged damages were proximately caused by their own negligence and intentionally fraudulent and manipulative conduct, and plaintiffs are therefore precluded from recovery.

### Third Affirmative Defense:

63.  EMTA repeats and realleges paragraphs 1 - 62 as if set forth fully herein.

64.   Plaintiffs' claims are barred by reason of their own unclean hands

### Fourth Affirmative Defense:

65.   EMTA repeats and realleges paragraphs 1 - 64 as if set forth fully herein.

66.   By complying with plaintiffs' demands, EMTA would have been participating in aiding and abetting plaintiffs' illegal conduct, and therefore EMTA is as a matter of law excused from complying with plaintiffs' requests.

### Fifth Affirmative Defense:

67.   EMTA repeats and realleges paragraphs 1 - 66 as if set forth fully herein.

17

68.    The SPA and each of the Convertible Notes held by plaintiffs is void under §29(b) of the 1934 because performance of these contracts would contravene the federal securities laws and the Regulations and Rules promulgated by the SEC.

**Sixth Affirmative Defense:**

69.    EMTA repeats and realleges paragraphs 1 - 68 as if set forth fully herein.

70.    The SPA and each of the Convertible Notes should be rescinded because of plaintiffs' fraudulent inducement; because these agreements resulted from plaintiffs' common law fraud; and because these agreements violated §§10(b) and 29(b) of the 1934 Act and the Regulations and Rules thereunder.

**Seventh Affirmative Defense:**

71.    EMTA repeats and realleges paragraphs 1 - 70 as if set forth fully herein.

72.    Any non-performance by EMTA of the terms of the  SPA and the Convertible Notes is excused by plaintiffs' breach, anticipatory breach and repudiation of these agreements consisting of conduct which includes, but is not limited to short selling of EMTA stock, the illegal manipulation of the market price of EMTA stock, and failing to comply with SEC Regulations C, X and SHO, and SEC Rules 424 and 427.

**Eighth Affirmative Defense:**

73.    EMTA repeats and realleges paragraphs 1 - 72 as if set forth fully herein.

74.    Plaintiffs have failed to comply with the "notice of default" and "right to cure" provisions in the Convertible Notes.

## COUNTERCLAIMS

**First Counterclaim:**

## Securities Fraud in Violation of §10(b) of the 1934 Act and Rule 10b-5:
**(Damages for Fraudulent Inducement of the Sale
of the Convertible Notes and Warrants)**

75.     EMTA repeats and realleges paragraphs 1 - 74 as if set forth fully herein.

76.     The convertible notes and warrants plaintiffs acquired from EMTA are securities as defined in §3(a)(1) of the 1934 Act, 15 US.C. §78(c)(a)(1), and are equity securities within the meaning of §3(a)(11), of the 1934 Act, 15 U.S.C. §78(c)(a)(11) because they are convertible into common stock of EMTA.

77.     Relying on plaintiffs' representations that they would not short-sell EMTA stock or engage in any practices which would artificially depress the price of EMTA stock or unfairly exploit the conversion provisions set forth in the Notes, EMTA entered into the SPA and the Convertible Notes with plaintiffs and issued the warrants described herein to the plaintiffs.

78.    Plaintiffs' representations that they would not short-sell EMTA stock or engage in any practices which would artificially depress the price of EMTA stock or exploit the conversion provisions set forth in the Notes were knowingly and intentionally false at the time they were made.

79.     Plaintiffs' misrepresentations concerning their purpose and intentions in connection with these transactions were material and EMTA reasonably and detrimentally relied upon these

plaintiffs' misrepresentations in assenting to the SPA and in agreeing to issue the Convertible

Notes and warrants to plaintiffs.

80.  Plaintiffs' scheme defrauded EMTA by use of means and /or instrumentalities of

interstate commerce and/or the United States mails and/or wire services in violation of §10(b) of

the 1934 Act, 15 U.S.C. §78(j), by causing EMTA to sell securities consisting of the "convertible

notes" and warrants to plaintiffs.

81.  EMTA has been damaged in its business and property as a result of plaintiffs'

conduct, and is entitled to an award of monetary damages to redress its injury.

**Second Counterclaim:**

**<u>Rescission of the Convertible Notes and Warrants Pursuant to §29(b) of the 1934 Act</u>**

82.    EMTA repeats and realleges paragraphs 1 - 81 as if set forth fully herein.

83.    § 29(b) of the 1934 Act, 15 U.S.C. §78cc(b) provides that:

> Every contract made in violation of any provision of  this chapter or of
> any rule or regulation thereunder,  . . . [or] the performance of which involves the
> violation of, or the continuance of any relationship  or practice in violation of, any
> provision of this chapter or any rule or regulation thereunder, shall be void.

84.  An agreement to purchase securities that is induced by fraud is, under §29(b) of the

1934 Act, 15 U.S.C. §78cc(b) voidable at the election of the defrauded party.

85.    The Convertible Notes and warrants plaintiffs acquired from EMTA are securities

as defined in §3(a)(1) of the 1934 Act, 15 US.C. §78(c)(a)(1), and are equity securities within the

meaning of §3(a)(11), of the 1934 Act, 15 U.S.C. §78(c)(a)(11) because they are convertible into

common stock of EMTA.  The Convertible Notes and warrants, as well as the SPA, are

"contracts" relating to the sale of securities within the meaning of §29(b) of the 1934 Act, 15 U.S.C. §78cc(b).

86.   Relying on plaintiffs' representations that they would not short-sell EMTA stock or engage in any practices which artificially depressed the price of EMTA stock or unfairly exploited the agreed upon conversion terms, EMTA entered into the SPA and the Notes with plaintiffs and issued the warrants described herein to the plaintiffs.

87.   Plaintiffs' representations that they would not short-sell EMTA stock or engage in any practices which would artificially depress the price of EMTA stock or unfairly exploit the agreed-upon conversion terms were knowingly and intentionally false at the time they were made.

88.   Plaintiffs' misrepresentations concerning their purpose and intentions in connection with these transactions were material and EMTA reasonably and detrimentally relied upon these plaintiffs' misrepresentations in assenting to the SPA and in agreeing to issue the Convertible Notes and warrants to plaintiffs.

89.   Plaintiffs' scheme defrauded EMTA by use of means and /or instrumentalities of interstate commerce and/or the United States mails and/or wire services in violation of §10(b) of the 1934 Act, 15 U.S.C. §78(j), by causing EMTA to sell securities consisting of the "convertible notes" and warrants to plaintiffs.

90.   EMTA has been damaged in its business and property as a result of plaintiffs' conduct.

91.   EMTA is therefore entitled to rescission of the SPA, the Convertible Notes and

21

warrants under §29(b) of the 1934 Act, 15 U.S.C. §78cc(b) and the disgorgement of plaintiffs'
profits stemming from these transactions.

**Third Counterclaim:**

**Securities Fraud in Violation of §10(b) of the 1934 Act and Rule 10b-5:**
**Illegal Trading Scheme Involving Short-Sales**

92.    EMTA repeats and realleges paragraphs 1 - 91 as if set forth fully herein.

93.    In violation of their contractual, written, express, verbal and implied
representations to EMTA, and as part of a deliberate scheme to obtain ownership of EMTA's
valuable technologies, plaintiffs engaged in an illegal trading scheme aimed at artificially
depressing the price of EMTA stock to the point where EMTA would not have any other source
of funding available to it.

94. Plaintiffs effected this strategy by short-selling their EMTA stock and selling at or
even below the bid price, as alleged in paragraphs 40 - 42, *supra*.   By short selling the stock and
creating and artificially depressed price, plaintiffs illegally manipulated the conversion agreed-
upon conversion formula, and obtained more EMTA stock than they would have received if the
illegal short-selling of the stock had not occurred.  By obtaining more EMTA stock then it was
entitled to under the Convertible Notes, plaintiffs caused the price of EMTA stock to decline
because the volume of shares available in the market increased, while demand for the stock
remained constant.

95.  The resulting decline in the price of EMTA stock was beneficial to plaintiffs since it
lowered the conversion price that plaintiffs would have to pay under the formula set forth in the

Notes.

96.  Plaintiffs' scheme involved illegally-short selling EMTA stock, as set forth above. Plaintiffs then acquired registered EMTA shares by converting their rights under the Notes. Upon conversion, plaintiffs were able to obtain large amounts of EMTA stock, which it was able to profitably sell even in a declining market.

97. EMTA has been injured in its business and property by plaintiffs' illegal short selling scheme, and is entitled to an award of money damages to redress its injuries which includes the damages stemming from the decline in value of the market price of EMTA stock that is attributable to plaintiffs' illegal conduct.

### Fourth Counterclaim:

### Breach of Contract

98.    EMTA repeats and realleges paragraphs 1 - 97 as if set forth fully herein.

99.  In ¶4(n) of the SPA, plaintiffs represented that they would not short-sell EMTA stock. EMTA reasonably and detrimentally relied on this contractual representation.

100.  Shortly upon exercising their conversion rights under the Notes and obtaining EMTA stock, plaintiffs proceeded to systematically breach their contractual representation that they would not short-sell the stock.

101. Plaintiffs effected this strategy by short-selling their EMTA stock and selling at or even below the bid price, as alleged in paragraphs 40-42, *supra*.   By short selling the stock and creating an artificially depressed price, plaintiffs' illegally manipulated the agreed-upon conversion formula, and obtained more EMTA stock than they would have received if the illegal

23

shorting of the stock had not occurred.  By obtaining more EMTA stock than they were entitled to obtain, plaintiffs caused the price of EMTA stock to further decline because the volume of shares available in the market increased, while demand for the stock remained constant.

102.  The resulting decline in the price of EMTA stock was beneficial to plaintiffs since it lowered the conversion price that plaintiffs would have to pay under the formula set forth in the Notes.

103.  Plaintiffs' scheme involved illegally short selling EMTA stock, as set forth above. Plaintiffs then acquired registered EMTA shares by converting their rights under the Notes. Upon conversion, were able to obtain large amounts of EMTA stock, which it was able to profitably sell even in a declining market.

104.    Plaintiffs' short-selling of EMTA stock in violation of their contractual representations to EMTA was part of a deliberate scheme to obtain ownership of EMTA's valuable technologies by causing an artificial depression of EMTA stock to the point where EMTA would not have any other source of funding available to it and would be so substantially indebted to plaintiffs that plaintiffs would eventually be able to take over EMTA's assets.

105. EMTA has been injured in it business and property by plaintiffs' illegal short selling scheme, and is entitled to an award of money damages to redress its injuries  which includes the damages stemming from the decline in value of the market price of EMTA stock that is attributable to plaintiffs' illegal conduct.

**Fifth Counterclaim:**

**<u>Common Law Fraud</u>**

106.    EMTA repeats and realleges paragraphs 1 - 105 as if set forth fully herein.

107.    Relying on plaintiffs' representations that they would not short-sell EMTA stock or engage in any practices which artificially depressed the price of EMTA stock or unfairly exploited the agreed-upon conversion terms, EMTA entered into the SPA and the Convertible Notes with plaintiffs and issued the warrants described herein to the plaintiffs.

108.    Plaintiffs' representations that they would not short-sell EMTA stock or engage in any practices which would artificially depress the price of EMTA stock or exploit the agreed-upon conversion terms were knowingly and intentionally false at the time they were made.

109.    Plaintiffs' misrepresentations concerning their purpose and intentions in connection with these transactions were material and EMTA reasonably and detrimentally relied upon plaintiffs' representations in assenting to the SPA and in agreeing to issue the Convertible Notes and warrants to plaintiffs.

110.    EMTA would not have entered into the SPA or issued the Convertible Notes or warrants to plaintiffs if plaintiffs had not made these representations.

111.    Shortly after exercising their conversion rights under the Notes and obtaining EMTA stock, plaintiffs proceeded to systematically breach their contractual representation that they would not short-sell the stock.

112. Plaintiffs effected this strategy by short-selling their EMTA stock, and selling at or

even below the bid price as alleged in paragraphs 40-42, *supra*.   By short selling the stock and creating an artificially depressed price, plaintiffs illegally manipulated the agreed-upon conversion formula, and obtained more EMTA stock than they would have received if the illegal shorting had not occurred.

113.   By obtaining more EMTA stock than they were entitled to, plaintiffs caused the price of EMTA stock to further decline because the volume of shares available in the market increased, while demand for the stock remained constant.

114.  The resulting decline in the price of EMTA stock was beneficial to plaintiffs since it lowered the conversion price that plaintiffs would have to pay under the formula set forth in the Notes.

115.  Plaintiffs scheme involved illegally short selling EMTA stock, as set forth above. Plaintiffs then acquired registered EMTA shares by converting their rights under the Notes. Upon conversion, were able to obtain large amounts of EMTA stock, which it was able to profitably sell even in a declining market.

116.   EMTA is entitled to rescission of the SPA, the Convertible Notes and the warrants on the grounds of plaintiffs' fraud in the inducement, and is also entitled to the disgorgement of plaintiffs' profits.

117. EMTA is also entitled to an award of money damages to redress its injuries which includes the damages stemming from the decline in value of the market price of EMTA stock attributable to plaintiffs' fraudulent conduct.

**Sixth Counterclaim:**

**Request for a Declaratory Judgment Voiding the SPA, the
Convertible Notes and the Warrants on Grounds
of Illegality Pursuant to §29(b) of the 1934 Act**

118.   EMTA repeats and realleges paragraphs 1 - 117 as if set forth fully herein.

119.   Plaintiffs' exercise of their conversion rights was inextricably intertwined with their illegal short-selling in violation of Regulation SHO and Regulation X which governs a customers' receiving credit from its broker, and illegal and unfair practice of selling of EMTA at the bid price and lower.  Plaintiffs' performance of SPA and Convertible Notes necessarily and inextricably involved primary and secondary violations of the 1934 Act and the Rules and Regulations promulgated thereunder.

120.   Accordingly, the SPA and the Convertible Notes involved are therefore illegal and void under §29(b) of the 1934 Act, 15 U.S.C. §78cc(b) .

**Seventh Counterclaim:**

**Conversion**

121.    EMTA repeats and realleges paragraphs 1 - 120 as if set forth fully herein.

122.   Plaintiffs' misrepresentations that they would not short sell EMTA stock constitutes conversion of Cyberlux's notes.

123.   EMTA has been injured in their business and property by plaintiffs' acts of conversion.

27

**Eighth Counterclaim:**

**<u>Request for Declaratory Judgment Pursuant to 28 U.S.C. §§ 2201-2202</u>**

124.   EMTA repeats and realleges paragraphs 1 - 123 as if set forth fully herein.

125.   An actual and existing controversy exists concerning the validity of the SPA, the Convertible Notes and warrants within the meaning of 28 U.S.C. §2201.

126.   EMTA's injuries cannot be fully redressed by an award of money damages.

127.   EMTA is entitled to a judgment declaring void and cancelling all EMTA stock held by plaintiffs, and further declaring any rights plaintiffs' claim under the SPA, the Convertible Notes and warrants to be null and void.

**Ninth Counterclaim:**

**<u>Request for a Permanent Injunction</u>**:

128.   EMTA repeats and realleges paragraphs 1 - 127 as if set forth fully herein.

129.   EMTA will suffer permanent and irreparable harm unless plaintiffs are enjoined from seeking to exercise the conversion terms of the Convertible Notes and issue default notices to EMTA.

130.    EMTA's injuries cannot be fully redressed by an award of money damages.

131.   EMTA is entitled to a permanent injunction prohibiting plaintiffs from attempting to exercise any conversion rights under the Convertible Note and further prohibiting plaintiffs from issuing any further default notice to EMTA.

WHEREFORE, EMTA demands judgment as follows:

1. On the First Claim, money damages in an amount to be determined at trial but in any event no less than $3 million.

2. On the Second Claim, rescission of the SPA, the Convertible Notes and the warrants and award requiring plaintiffs to disgorge their profits from the trading on EMTA stock.

3. On the Third, Fourth and Seventh Claims, money damages in an amount to be determined at trial but in any event no less than $6 million.

4. On the Fifth Claim, money damages in an amount to be determined at trial but in any event no less than $6 million; and rescission of the SPA, the Convertible Notes and the warrants and award requiring plaintiffs to disgorge their profits from the trading on EMTA stock.

5. On the Sixth and Eighth Claims, a declaratory judgment voiding the SPA, the Convertible Notes and the Warrants.

6. On the Ninth Claim, an injunction prohibiting plaintiffs from attempting to exercise any conversion rights under the Notes and prohibiting plaintiffs from issuing any default notices.

Dated:  New York, New York          Eric W.  Berry Law Office pc
          November 12, 2007

                                              By: _____
                                              Eric W.  Berry [EB8598]
*Attorneys for defendant EMTA Holdings, Inc.*
132 Nassau Street, Suite 1300
New York, New York    10038
(212) 355-0777

29

Case No.  8719                    Year 2007
Civil Case                       Judge Crotty


AJW PARTNERS, LLC, AJW OFFSHORE,
LTD, AJW QUALIFIED PARTNERS, LLC,
and NEW MILLENNIUM CAPITAL
PARTNERS II, LLC,

                              Plaintiffs,

        - against -

EMTA HOLDINGS, INC.,

                              Defendant.


### Answer, Affirmative Defenses and Counterclaims


ERIC W.  BERRY LAW OFFICE PC
*Attorneys for defendant*
*EMTA Holdings, Inc.*
132 NASSAU STREET, SUITE 1300
NEW YORK, NEW YORK  10038
(212) 355-0777